**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 07-31230 |
| | ) | |
| Craig Allen Lubinski and | ) | Chapter 7 |
| Laura Lynn Lubinski, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

**MEMORANDUM OF DECISION AND ORDER
REGARDING MOTION TO DISMISS**

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 8] and Debtor's response [Doc. # 22]. The court held a hearing on the motion that Debtors, their counsel and counsel for the UST attended in person and at which the parties presented testimony and other evidence in support of their respective positions. The court has jurisdiction over this case under 28 U.S.C. §1334 and the general order of reference entered in this district. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(A). Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtors' Chapter 7 case unless they convert it to Chapter 13.

**BACKGROUND**

Debtors are married and have three dependent children, ages eleven, twelve and fourteen. Craig

Lubinski is a teacher employed by the Toledo Public Schools where he has worked for twenty-one years. He is also employed during the summer each year for several weeks at a football camp at The Ohio State University. Until August 2007, he also received income working as an assistant wrestling coach at a local high school. Although Debtors' bankruptcy Schedule I reports monthly gross income for Craig Lubinski in the amount of $5,762, that figure included his income earned as a wrestling coach. However, since a new head coach who chose his own staff has taken over, he no longer works in that position, resulting in a decrease in monthly gross income of approximately $300.

Laura Lubinski ("Lubinski") was not employed outside the home while her children were younger but began working in September 2000 at Daimler Chrysler where she was employed as an instructor for employees working on a General Education Diploma ("GED"). Her wages of approximately $2,000 per month in that position were funded by grants and, according to Lubinski, she received her paychecks on a very irregular basis. Sometimes waiting as long as eight weeks to receive a paycheck, she would use cash advances from a credit card to meet expenses while she waited. In mid-August 2004, after receiving only a five-day notice, she was terminated from her position because its funding had expired. Although she was assured that new funding would be obtained in just a few weeks and that she would be able to return to work, the funding apparently never materialized.

Between August 2004 and May 2005, Lubinski worked on a part-time basis as a substitute teacher in a local school district and as a GED test administrator for Lucas County, Ohio. During that time period she earned approximately $3,000. After realizing that the Daimler Chrysler job was no longer a viable option, she took a position as a loan officer at a mortgage company and then as a secretary at the University of Toledo before accepting her current position as a customer service representative at Spartan Chemical. Although she has only been employed there since April 2007, she considers her job to be stable. She earns a monthly gross income of $1,834.

In 2003, before Lubinski lost her job at Daimler Chrysler, Debtors purchased a home in Waterville, Ohio. The Waterville location was attractive to them since, according to Lubinski, it is in what Debtors believe to be a public school system with high academic standards, which their children now attend rather than the private school Debtors were paying for them to attend before the move. They financed $219,000 of the $232,000 purchase price. Their first mortgage payment, including property tax and insurance, is approximately $1,881.

In early 2004, Debtors obtained a $30,000 variable rate home equity loan that they used to consolidate some of their credit card debt. The home equity loan is secured by a second mortgage on their

home and requires monthly payments in the amount of $360. Before Lubinski lost her job at Daimler Chrysler, Debtors also purchased an in-ground swimming pool at a cost of $22,500 that they financed with a loan secured by a third mortgage on the Waterville home. They pay $260 per month on the third mortgage loan and approximately $250 to $375 per year for other expenses associated with owning the pool, such as heat, chemicals, filter, etc.

At the time Debtors purchased their Waterville home and had the swimming pool installed Debtors had approximately $87,000 of credit card debt, which Lubinski testified was the result of buying over a period of seventeen years. Nevertheless, she testified that they were able at that time to pay their debts from their earnings as the debts became due. This changed, however, when Lubinski's position at Daimler Chrysler was terminated. During the couple of years that followed, Lubinski closed her retirement annuity, yielding approximately $14,000, and Craig Lubinski borrowed approximately $19,000 against his 403(b) retirement plan account in order to meet their debt obligations. Lubinski testified that she attempted to work with the credit card companies and had arranged a payment plan with one company that involved automatic monthly withdrawals from her bank account. Debtors also sought the help of a debt settlement company to assist in coming to some agreement with the credit card companies as to payment of their credit card debt. They made monthly payments of $267 to the company for six months. Ultimately, however, no agreement was reached with the credit card companies and Debtors stopped making those payments.

In the meantime, their credit card interest rates jumped from promotional rates as low as 2.9% to approximately 30% as a result of missed payments. Although, according to Lubinski, with the exception of two store cards with small balances used for buying clothing for their children, Debtors had not used their credit cards since 2003, their credit card balances had increased to over $93,000. In addition, as a result of two missed payments and an increase in property taxes, their first mortgage payments increased by $160 since purchasing their home. And due to an increase in the interest rate, their home equity loan payment more than doubled since incurring that debt.

On April 3, 2007, Debtors filed for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts. Debtors' Schedule D shows total secured debt in the amount of $288,331. Their secured debts include $271,077 secured by their home, which Lubinski valued at the time of the hearing at approximately $240,000, as well as $14,200 secured by their 2002 Mercury Mountaineer and $3,053 secured by their 2000 Jeep Wrangler. Debtors' Statement of Intention indicates that they intend to reaffirm all of their secured debt. Their bankruptcy schedules also show unsecured nonpriority debts, consisting almost entirely of credit card obligations, in the total amount of $93,483. Debtors have no

priority unsecured debt.

Debtors' amended Schedule I shows gross monthly income in the combined total amount of $7,596 and net monthly income after payroll deductions in the amount of $5,419. With the loss of Craig Lubinski's $300 per month gross coaching income, which the court estimates is a loss of approximately $200 of net income, Debtors' net monthly income after payroll deductions is approximately $5,219. Lubinski testified that Debtors also received a federal income tax refund for the year 2005 in the amount of $9,465. For the 2006 tax year, Debtors received a federal income tax refund of $3,984, but paid state and local income taxes in the amounts of $650 and $951, respectively. The net amount in refunds received by Debtors for the 2006 tax year was, therefore, $2,383. According to Lubinski, Debtors previously used the excess withholding for federal income tax purposes from Craig Lubinski's pay as a means of saving to pay for their children's private school tuition but, since moving to Waterville, the refunds were used to pay bills and to repay, in part, Craig Lubinski's retirement plan loan.

Catherine Lowman, the UST's bankruptcy analyst testified that the decrease in Debtors' federal income tax refund in 2006 was primarily due to the fact that they were required to report as income amounts withdrawn from Lubinski's retirement annuity and borrowed from her husband's retirement plan. Assuming no further retirement income is withdrawn and reported as income, and assuming Debtors' level of income and mortgage interest paid remains at approximately the same level as in 2005, Lowman testified that their federal income tax refund will be close to the $9,465 received in 2005.

Debtors' amended Schedule J shows total monthly living expenses in the amount of $5,819. Their monthly expenses include, among other things, mortgage expenses of $2,501, home related utility expenses of $428, telephone, cablevision, and internet expenses of $127, cell phone expenses of $125, and total car payments of $561. Debtors' amended Schedule J shows that their monthly expenses exceed their income by approximately $400. With the loss of approximately $200 of net income due to Craig Lubinski's loss of his coaching income, as set forth in their amended Schedules I and J, their monthly expenses exceed their income by approximately $600.

Debtors' Form B22A shows that, based on their earnings over the six month period before filing, their annualized current monthly income was $81,314, which is approximately $5,500 above the applicable median income of $75,590 for a family of five in Ohio. No presumption of abuse arose under § 707(b)(2) after the calculation of allowed deductions. Instead, the UST filed a timely motion to dismiss for abuse under § 707(b)(3) based on the totality of the circumstances.

## **LAW AND ANALYSIS**

This case must be decided under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, ("BAPCPA" or "the Act") because it was filed on April 3, 2007, after the effective date of the Act. Where debts are primarily consumer debts, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g.*, *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3) by requiring a court to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).[1]

In this case, the UST contends that the totality of the circumstances show that Debtors are not needy and have the ability to repay a significant portion of their unsecured debt, pointing particularly to Debtors' mortgage and communication expenses as being unreasonably excessive and to the sizeable income tax refunds that they have received.[2] Debtors, for their part, argue that all of their expenses are reasonable and that imputing future federal income tax refunds as income is speculative. They point to their amended Schedules I and J and the monthly deficit indicated therein and argue that even if some portion of their listed expenses are unreasonable or excessive, they still do not have the ability to repay unsecured creditors.

The totality of the circumstances test allows the court to consider both prepetition and postpetition

---

[1] As this court noted in an earlier opinion:

> While Congress has clearly lowered the dismissal standard, articulation of what that change really means in decision-making in a particular case is a slippery enterprise at best. A totality of circumstances amounting to substantial abuse would obviously also amount to abuse. The converse is not necessarily true. Perhaps more telling legislative evidence of a Congressional intent that bankruptcy courts should now afford less deference to a debtor's choice of Chapter 7 relief is the elimination from amended § 707(b) of the language in former § 707(b) stating that "[t]here shall be a presumption in favor of granting the relief requested by the debtor."

*In re Carney*, No. 07-31690, 2007 WL 4287855, *2, 2007 Bankr. LEXIS 4100, *7 (Bankr. N.D. Ohio December 5, 2007).

[2] In his motion to dismiss, the UST also objects to an expense in the amount of $508 listed on Debtors' original Schedule J representing a 403(b) loan repayment. At the hearing, Debtors stated that they are no longer making payments on that loan and they have removed that expense in their amended Schedule J.

circumstances. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief*, which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Mestemaker*, 359 B.R. 849, 855-56 (Bankr. N.D. Ohio 2007); *In re Hartwick*, 359 B.R. 16, 21 (Bankr. D.N.H. 2007). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient under some circumstances to warrant dismissal. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27. The court addresses below the relevant factors comprising the totality of Debtors' financial circumstances.

**A. Debtors' Income**

Both Debtors now enjoy stable employment. Craig Lubinski has been employed as a teacher in Toledo Public Schools for over twenty-one years. Although he is no longer employed as a wrestling coach, there is no indication that either his employment as a teacher or his summer employment is in jeopardy. Likewise, Laura Lubinski considers her present job to be stable notwithstanding its relatively short duration. Their monthly income after payroll deductions and after adjusting for the loss of Craig Lubinski's coaching income is $5,219, and there is no indication that either Debtor anticipates a material decrease in their incomes in the next five years.

Although Debtors argue that the court should not impute as income any future tax refunds as doing so is too speculative, they admit that the amounts withheld from Craig Lubinski's pay is excessive. As there is no indication that income tax consequences such as those suffered in 2006 due to withdrawals from Debtors' retirement funds will occur in the future, Debtors have the ability to increase their monthly income after payroll deductions dramatically by reducing withholding amounts from Craig Lubinski's pay. Debtors received a federal income tax refund in 2005 in the amount of $9,465, representing excessive monthly withholding of over $780. Although, as discussed below, their mortgage interest expenses may decrease, the court believes that Debtors could comfortably reduce their payroll withholding amounts by at least $600 per month, which would yield total income after payroll deductions of $5,819.

**B. Ability to Pay**

Debtors point to their amended Schedules I and J in arguing that they do not have the ability to pay any of their unsecured debt. Even after the adjustments to monthly income as discussed above, Debtors net income after payroll deductions equals the expenses listed on their amended Schedule J with no excess for payment of unsecured debt. In assessing Debtors' ability to pay, however, the court is not required to accept all of the expenses as stated in their schedules. Rather, in evaluating the totality of the circumstances of Debtors' financial situation, the court must consider whether living expenses can be reduced significantly without depriving Debtors or their dependents of adequate food, clothing, shelter, and other necessities. *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge*, 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn,* 886 F.2d at 126.

The UST emphasizes as unreasonable Debtors' substantial mortgage expenses totaling $2,501, which is nearly 43% of their adjusted net monthly income and which they stated an intention to reaffirm. The court finds it significant in evaluating abuse that Debtors incurred new secured debts to buy a home and build a swimming pool at a time when they already had substantial credit card debt-- debt largely incurred before Lubinski's period of unemployment, which has now been resolved.

The UST also argues that Debtors' communication expenses and expenses for maintaining a swimming pool are unreasonable. The court will not, however, engage in the task of determining the proper amounts Debtors should spend on each expense category set forth in the amended Schedule J. Rather, the court takes the approach suggested in *In re Mars*, 340 B.R. 844 (Bankr. W.D. Mich. 2006), wherein the court explained:

> Too many courts have fretted over whether a debtor's budget should include an allowance for cigarettes or whether the debtor is driving too expensive of a car. Far more important is consideration of what is to be the fair division of a debtor's future income between his creditors and himself. A debtor should not be permitted to live extravagantly at his creditors' expense. However, it should be up to the debtor to decide how he spends his share once the appropriate allotment has been made.

*Id.* at 850.

In addition to their other living expenses, Debtors' amended Schedule J reflects a total of $709 budgeted for the following monthly expenses:

| | |
|---|---|
| Telephone, cablevision, and internet | $127 |
| Cellular telephones[3] | 125 |
| Clothing | 186 |

[3] Debtors' cell phone plan includes phones not only for themselves but also two phones for their children.

| | |
|---|---|
| Gifts | 70 |
| School expenses | 116 |
| Veterinary care | 37 |
| Miscellaneous | 85 |

"While bankruptcy relief is not conditioned upon a debtor living in poverty, it does envision a sacrifice on the part of the debtor." *In re Felske*, No. 07-33014, 2008 WL 339501, *4, 2008 Bankr. LEXIS 344, *13 (Bankr. N.D. Ohio Feb. 6, 2008). The court finds that Debtors are able to reduce these expenses by at least $200 without depriving themselves or their children of life's necessities. In addition, Debtors are paying approximately $212 per month on a debt secured by their 2000 Jeep Wrangler in the amount of $3,053 as of April 2007, the month Debtors filed their petition. This debt should be paid in full within fifteen to eighteen months after the date of filing, which would be within the next three to six months, after which those funds would be available to pay other expenses.

Debtors are eligible for Chapter 13 should they choose to seek such relief as an alternative to a Chapter 7 discharge. They are individuals with regular, stable income and their debts are less than the statutory eligibility limits. 11 U.S.C. § 109(e), 101(3). Debtors' income, as adjusted herein, and reasonable expenses show that they could fund a Chapter 13 plan that would pay a meaningful amount of their unsecured debt should they choose to do so. If, after the expense reductions discussed above, Debtors applied only $250 per month over the sixty-month maximum Chapter 13 plan duration for above-median income debtors, *see* 11 U.S.C. § 1322(d)(1), Debtors would on that basis alone, have approximately $14,000 available after payment of the Chapter 13 Trustee's administrative expenses to pay on their unsecured debt. As Debtors' schedules show unsecured debt in the amount of $93,483, and no unsecured priority debt, unsecured creditors may receive a dividend of nearly 15%. *See In re Behlke*, 338 F.3d 429, 437 (6th Cir. 2004) (finding *substantial* abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors); *In re Mooney*, 313 B.R. 709 (Bankr. N.D. Ohio 2004) (stating that "[a]t certain levels of income, it is incumbent upon higher income debtors who are not experiencing any ongoing calamity to accept responsibility and pay *something*, even if it is less than it should be due to retention of a large, secured debt) (emphasis in original)).

Moreover, if Debtors choose to seek relief under Chapter 13, they may be able to propose a plan taking advantage of a number of provisions under Chapter 13 that offer relief to financially distressed debtors, such as, cram down of certain debts and, and if they retain their home, stripping off at least the

third mortgage on their home under the authority of *In re Lane*, 280 F.3d 663 (6th Cir. 2002),[4] thus making available additional funds that could be used to increase the return to unsecured creditors.

**C. Availability of State Law or Private Remedies**

The availability of debtors' remedies under state law (such as a municipal court trusteeship or credit counseling proceedings that will stop wage garnishments under Ohio law) and the relief that might be afforded through private negotiations (such as a deed in lieu of foreclosure or extension and composition agreements with particular creditors) are other factors the Sixth Circuit has identified as relevant in deciding whether it would be an abuse to grant a Chapter 7 discharge in a particular case. Debtors tried to privately negotiate with their unsecured creditors; however, for the most part, their efforts were unsuccessful. This fact weighs in Debtors' favor under the totality of the circumstances, although it does not outweigh the other considerations articulated above. The court also notes that the $267 monthly payment Debtors made for six months to try to resolve consensually, but ultimately unsuccessfully, their unsecured debts approximates the outcome the court projects as being achievable under the protection and structure of Chapter 13 without the consent of their unsecured creditors upon compliance with 11 U.S.C. §§ 1301 *et seq*.

Neither party has addressed the availability of state law remedies. As the UST bears the burden of proof on the motion, *In re Wright*, 364 B.R. 640, 643 (Bankr. N. D. Ohio 2007), the court will assume that there are no such state law remedies or further private negotiations that will assist in resolving Debtors' financial problems.

**CONCLUSION**

In sum, the court finds that the following factors demonstrate that granting Debtors relief in this case under Chapter 7 of the Bankruptcy Code would be an abuse of that chapter given the totality of their financial circumstances: they have stable employment, above median income status, incurred substantial new secured debt, including for a pool, at a time when they already had substantial unsecured debt, can reduce income tax over-withholding to better manage paying monthly living expenses, and have the ability to reduce discretionary expenses without impacting basic requirements for food, shelter, clothing, and other necessities, either inside or outside Chapter 13, thereby making funds available that could be used to provide meaningful repayment to unsecured and undersecured creditors.

**THEREFORE,** for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtors are allowed thirty (30) days from the date of this order to file a

[4] Stripping off the third mortgage should the facts support it, as they appear to from Debtors' Schedule D and testimony regarding the value of their home, would add approximately $21,000 to their unsecured debt, but would also relieve them of the third mortgage payment of $260 per month.

motion to convert to a Chapter 13 case, absent which the United States Trustee's motion to dismiss [Doc. #8] will be granted, and this case will be dismissed by separate order of the court.